**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| | **:** | |
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No.: 23-CR-357 (JMC)** |
| | **:** | |
| **RALLY RUNNER,** | **:** | |
| **F.K.A. DANIEL DONNELLY, JR.** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |
| | **:** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence the defendant, Rally Runner, to 27 months of imprisonment, at the midpoint of Runner's advisory Guidelines range, three years of supervised release, restitution of $2,000, and a mandatory assessment of $100.

**I.      INTRODUCTION**

The defendant, Rally Runner, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

_____

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The

Runner, a 44-year-old man from St. Louis, joined the chaos in the Lower West Terrace tunnel on January 6, using a police riot shield to lead the mob in overrunning a line of police officers. He contributed to the chaos, first by passing a ladder toward the tunnel, then by taking a riot shield to the tunnel's entrance. He used the shield to provide cover for rioters who assaulted officers, and then he pushed his way into the tunnel. Using the shield and his large, athletic body to force his way inside and into a wall of police officers, Runner led the angry mob into the tunnel. Only once police reinforcements arrived were they able to expel Runner from the area. Later that evening, he posted a 26-minute Facebook video in which he proudly described his conduct and bragged about his accomplishments.

The government recommends that the Court sentence Runner to 27 months of incarceration for his conviction of violating 18 U.S.C. § 231(a)(3). A 27-month sentence reflects the gravity of Runner's conduct, but also acknowledges his admission of guilt.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 33, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

---

Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

**B.** **Runner's Role in the January 6, 2021 Attack on the Capitol**

Rally Runner (formerly Daniel Donnelly, Jr.) traveled to Washington, D.C. on January 5, 2021, to attend former President Trump's rally at the Ellipse. On January 6, 2021, Runner attended the rally and intended to show his support by running around the rally in what he called a "Rally Run." Throughout the day, he wore a red "Keep America Great" hat, a red jacket, and red face paint. *See Image 1.*



*Image 1: screenshot from Sentencing Exhibit 4 at 0:01 shows Runner in the Facebook video he posted on the evening of January 6. He wore the same red face paint and red attire in the video that he wore throughout the day on January 6.*

After the rally, Runner proceeded to the U.S. Capitol. Once on Capitol grounds, Runner made his way through the crowd and up to the entrance of the Lower West Terrace doorway (also known as the "tunnel") of the U.S. Capitol building. At the time of Runner's approach, the Capitol's Lower West Terrace was filled with rioters and law enforcement officers were positioned in the tunnel. The two groups faced off at the tunnel's entrance as rioters tried to make their way into the Capitol building, and police officers attempted to prevent them from doing so.

Runner, standing just outside the tunnel, first helped the crowd pass a ladder toward the tunnel's opening. *See Image 2.*



*Image 2: Runner, circled in yellow, helps pass a ladder toward the tunnel.*

After helping pass the ladder forward, Runner obtained a riot shield. He was carrying the shield when, around 4:10 p.m., he made his way through the crowd to the threshold of the tunnel. *See Image 3.*



*Image 3: a screenshot from Sentencing Ex. 1 at 00:59 shows Runner holding the shield just outside the tunnel.*

While police attempted to push the mob out of the tunnel, waving at the crowd and yelling at them to move back, some particularly aggressive rioters surged forward to attack the officers.

Meanwhile, Runner stood in place, holding the shield and occupying space while he faced off with the police. All around, rioters engaged in violent physical attacks against the officers, kicking, screaming, and fighting. Several rioters used Runner as a human shield; one leaned over Runner and sprayed chemical irritants toward the police while Runner held the shield upright. *See Image 4.*



*Image 4: screenshot from Sentencing Ex. 2 at 2:20. A rioter uses Runner and his shield (yellow arrow) for protection as he sprays chemical spray at officers in the tunnel.*

At one point, the violence began to ebb, and Runner used the opportunity to form a wall of shields with other rioters, creating a phalanx in opposition to the police line. Other rioters again used Runner as a shield as they lunged past him to attack law enforcement officers. One rioter dove in front of Runner, grabbed an officer by the arm and tried to pull the officer back into the crowd. *See Image 5.*



*Image 5: screenshot from Sentencing Exhibit 3 at 9:34. Runner, circled in yellow, holds a shield and looks on as another rioter attempts to pull a police officer into the crowd.*

With the mob surging into the mouth of the tunnel, a knot of rioters formed against the police line. The crowd, bodies clustered tightly together, squeezed forward into the tunnel. Runner used his substantial size—the PSR reports that Runner stands 6' 5" and 220 lbs. (PSR ¶ 83) —to muscle his way into the line of officers. For the next several minutes, he held the shield in front of him, pressing into the officers, slowly inching forward. *See Image 6.*



*Image 6: screenshot from Sentencing Ex. 1 at 4:02, showing Runner, (shown by yellow arrow) behind the shield, pressing against officers.*

Runner, using his shield and the mob of rioters around him, continued to gain ground into the tunnel and managed to force the group of police nearly into the Capitol building. *See Image 7.*



*Image 7: screenshot from Sentencing Ex. 2 at 2:06, showing Runner having pushed nearly all the way inside the Capitol building.*

Finally, after approximately ten minutes of pushing, other law enforcement officers came to the aid of the officers in the tunnel. Runner lost the shield, and police were able to push Runner out of the tunnel area, along with the rest of the mob.

On his way out, Runner paused at the mouth of the tunnel, looked out on the crowd, and triumphantly extended his fist into the air. *See Image 8.*



*Image 8: screenshot from Sentencing Ex. 2 at 5:28.*

### *Runner's Post-January 6 Statements*

Later in the day, while still wearing his red "Keep America Great" hat, red jacket, and red face paint, Runner posted an approximately 26-minute-long video to his Facebook page. In it, he

described his actions on January 6 and reveled in the violence he had been a part of. In the video,

Runner made the following comments:

> I get a riot shield, and I'm not trying to cause any violence, but I'm trying to be the furthest person to get through all the way, or at least get the furthest.

> I took up a lot of space, and I had the rioter shield, and I was right up there, and for some reason, like, the other people up there on the front lines with me, they did something similar... It's like they followed my lead, kind of, and it turned out to be a great strategy because the whole crowd was doing that, was able to push further than we had gotten the whole time, the entire time.

> We pushed them all the way into the doors. It was working until more cops showed up. I'm right at the front of it and got through those doors into the Capitol, and that's when reinforcements came.

> [T]he burning of the mace was horrible, I mean my skin is already sensitive so I think it affected me more than others, but I withstood it pretty well and I was like even when I was inside and I was breathing it in I was like alright I can handle this, this isn't that bad, I'm not going to let this deter me.

> I got further than anyone, I literally got further than anyone. I helped us get that far.

On January 11, 2021, just a few days after January 6, FBI agents interviewed Runner. During that interview, he acknowledged that he had been at the Capitol on January 6. He said he had "been given" a riot shield, and he denied having entered the Capitol building. He did not express any remorse or regret for his actions that day.

### III.    THE CHARGES AND PLEA AGREEMENT

On October 11, 2023, a federal grand jury returned an indictment charging Runner in five counts with violating: 18 U.S.C. § 231(a)(1) (civil disorder) (Count One); 18 U.S.C. § 1752(a)(1) (entering and remaining in a restricted building or grounds) (Count Two); 18 U.S.C. § 1752(a)(2) (disorderly and disruptive conduct in a restricted building or grounds) (Count Three); 40 U.S.C.

§ 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Four); and 40 U.S.C. § 5104(e)(2)(E), (impeding passage through the Capitol grounds or buildings) (Count Five).

On, March 22, 2024, Runner was convicted of Count One based on a guilty plea entered pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Runner now faces sentencing for violating 18 U.S.C. § 231(a)(1) (civil disorder) (Count One). As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to up to five years of imprisonment, a term of supervised release of not more than three years, a fine of $250,000, restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The PSR includes the same Guidelines analysis included in the plea agreement, with which the government agrees. That Guidelines analysis follows:

Count One: 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Physical Contact | +3 |
| Adjusted Offense Level: | | 13 |
| Acceptance of Responsibility: | | -2 |
| **Total Adjusted Offense Level:** | | **11** |

*See* PSR ¶¶ 39-49; Plea Agreement ¶ 5(A).

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. As the parties agreed in the plea agreement, (*see* Plea Agreement ¶ 5(C)), § 4C1.1 does not apply in this case because the defendant received criminal history points. The PSR also arrives at the same result: "The defendant does not qualify for the Zero-Point Offender Adjustment, pursuant to USSG § 4C1.1(a) because he received criminal history points." PSR at ¶ 48.

The U.S. Probation Office calculated the defendant's criminal history as category V. PSR ¶ 62. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 11, Runner's Guidelines imprisonment range is 24 to 30 months' imprisonment. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.  SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.  Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Runner's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Runner participated by using a riot shield to force his way into a wall of police officers, nearly making his way inside the Capitol building. He provided cover

11

and protection to other rioters who sprayed police with irritants and he looked on as a rioter tried to drag an officer away from safety. The nature and circumstances of Runner's offense were of the utmost seriousness, and fully support the government's recommended sentence of 27 months of incarceration.

### B.  The History and Characteristics of the Defendant

Runner is a 44-year-old man from St. Louis. PSR at p.2. He is currently unemployed. PSR ¶ 107. The defendant has a significant history of arrest and conviction, which weighs in favor of a significant period of incarceration:

- In 1997, Runner was charged with possession of a controlled substance (felony). He received a deferred sentence of 1 year. PSR ¶ 50.

- In 2002, Runner was charged with passing bad checks of $500 or more. He received a 5-year suspended sentence and probation. He allegedly passed 19 bad checks throughout Boone, Missouri. PSR ¶ 51.

- In 2003, Runner was again charged with passing a bad check. He received a four-year suspended sentence and five years of probation. He was alleged to have passed a check in the amount of $805.24. PSR ¶ 52.

- In 2003, Runner was charged with violating of an order of protection. He received a suspended sentence and probation. In that case, Runner was alleged to have stalked the 17-year-old female complainant. PSR ¶ 53.

- In 2007, Runner was charged with several traffic violations. He was assessed a fine. PSR ¶ 54.

- Also in 2007, Runner was charged with trespass, 1st degree. He was assessed a fine. PSR ¶ 55.

- In 2010, Runner was charged with 2nd degree burglary, for which he was sentenced to five years of incarceration (to run concurrently with the following three sentences, also from 2010). PSR ¶ 56.

- Also in 2010, Runner was charged with theft of between $500 and $25,000 and sentenced to five years of incarceration (to run concurrently with the previous and following sentences, also from 2010). Runner allegedly stole a bicycle. PSR ¶ 57.

12

- Also in 2010, Runner was charged with stealing a motor vehicle and witness tampering. He was again sentenced to five years of incarceration on the charge of stealing a motor vehicle and 6 months each on two charges of witness tampering (all sentences to run concurrently with the previous sentences and following sentence, also from 2010). Runner allegedly stole a motor scooter and prevented the victim from seeking charges. PSR ¶ 58.

- Also in 2010, Runner was charged with theft of between $500 and $25,000 and sentenced to five years of incarceration (to run concurrently with the previous three sentences, also from 2010). Runner allegedly stole a bicycle. PSR ¶ 59.

- In 2015, Runner was charged with criminal trespass. He received a sentence of 60 days of supervision and a $150 fine. PSR ¶ 60.

- Runner also had multiple traffic violations in 2005, 2006, 2008, and 2010. PSR ¶¶ 63-66.

The defendant's crimes on January 6 were not an isolated event in an otherwise law-abiding life. They came, instead, after a long series of criminal offenses. The defendant's history demonstrates an abiding lack of respect for the rule of law that has lasted for many years. The defendant's history and characteristics, including his history of arrest and conviction, weigh heavily in favor of a lengthy term of incarceration.

**C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Runner's criminal conduct on January 6 was the epitome of disrespect for the law.

**D.   The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

13

domestic terrorism, which the breach of the Capitol certainly was.[2] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, Runner has an extended history of arrest and conviction, which shows a clear pattern of behavior and a demonstrated lack of respect for the rule of law. *See* Section VI(B) *supra.*

Second, although the defendant has now accepted responsibility for his actions on January 6, he has not expressed remorse. His social media statements after January 6 were gleeful and exuberant, exhibiting a complete absence of contrition. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

E.    **The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United*

---

[2] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

*States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means

that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[3]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[4] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Narayana Rheiner*, 22-CR-108 (DLF), Judge Friedrich sentenced the defendant to 15 months of incarceration following the defendant's plea to 18 U.S.C. § 231(a)(3).

---

[3] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Rheiner joined a mob that gathered on the Upper West Plaza of the Capitol building where he went to the front of the police line and waved other rioters to come forward and "push up" on the line. He then pushed against the officers and grabbed an officer's riot shield, pulling the shield out of the officer's hands. Rheiner later entered the Capitol building and proceeded to the Rotunda where police deployed chemical irritants against rioters including Rheiner. While other rioters continued to yell at the police officers, the defendant stood in close proximity to the officers, and said "We're not backing up!" Like Rheiner, Runner joined a mob—and led that mob against police officers. Rheiner also had an extended criminal including multiple arrests and convictions that totaled to a criminal history category IV—similar to, but not as significant as Runner's category V calculation. Runner's extended attack took considerably longer than the brief grabbing of the shield that Rheiner engaged in. Those differences explain the disparity between the 27-month sentence that is appropriate here and the 15-month sentence Rheiner received.

In *United States v. Julio Baquero*, 21-CR-702 (JEB), Chief Judge Boasberg imposed a sentence of 18 months of incarceration for a single violation of 18 U.S.C. § 231(a)(3) following a plea of guilty. Baquero entered the Capitol; joined a confrontation against officers, grabbing the hand of an officer holding a police baton; called the police "traitors"; and only departed when the police forced rioters out. As with the *Rheiner* case, Runner's conduct was substantially more aggressive than Baquero's. While Baquero only grabbed an officer's baton, Runner chose to use his shield to facilitate violent attacks on police officers and spent an extended period of time pushing against the police in the tunnel. Runner also has a substantial criminal history. Those facts explain the disparity between the 18-month sentence Baquero received and the 27-month sentence that is appropriate for Runner.

17

In *United States v. Hamner*, 21-CR-689 (ABJ), Judge Berman-Jackson imposed a sentence of 30 months of incarceration for a single violation of 18 U.S.C. § 231(a)(3) after the defendant pleaded guilty to that count.[5] Hamner wrestled barricades away from police that had been erected to keep a violent and hostile mob from entering the Capitol, and he participated in assaultive conduct. Like Runner, Hamner accepted responsibility for his criminal conduct, and also like Runner, Hamner had a lengthy criminal history. Hamner was ultimately convicted of assaulting police officers, and his conduct was likely more aggressive than Runner's. Those factors explain the difference between the 30-month sentence in that case and the 27-month sentence that is appropriate here.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

---

[5] Hamner was later convicted of additional counts because of his conduct on January 6, but the court did not sentence him to any additional period of incarceration beyond the 30 months.

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Runner must pay $2,000 in restitution, which reflects in part the role Runner played in the riot on January 6.[7] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Runner's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 153.

## VIII.   FINE

The defendant's conviction for a violation of 18 U.S.C. § 231(a)(3) subjects him to a statutory maximum fine of $250,000 or twice the pecuniary gain or loss of the offense. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the

---

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. S*ee United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $4,000 to $40,000. U.S.S.G. § 5E1.2(c).

## IX.     CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 27 months of imprisonment, at the midpoint of Runner's advisory Guidelines range, three years of supervised release, restitution of $2,000, and a mandatory assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:     */s/ Eric Boylan*
Eric Boylan
Assistant United States Attorney
Texas Bar No. 24105519
Capitol Siege Section
U.S. Attorney's Office
District of Columbia
Telephone No: (202) 815-8608
Email Address: eric.boylan@usdoj.gov